

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 FEB -8  PM 12: 00

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DIANA M. BREAUX  for J.A.B.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 04-1564** |
| **JO ANNE B. BARNHART,**<br>**COMMISSIONER OF SOCIAL**<br>**SECURITY ADMINISTRATION** | **SECTION "S"(3)** |

# REPORT AND RECOMMENDATION

Plaintiff J.A.B., the daughter of Diana M. Breaux. was found to be a disabled child under Title XVI of the Social Security Act effective April 1, 1990, on the basis of having met the requirements of section 100.02 (growth impairment) of the Listing of Impairments.[1]  Plaintiff remained on supplemental security income benefits and, upon reaching the age of 18,  her status was reviewed pursuant to applicable regulations.[2]   Disability was subsequently ceased effective May 31, 2001 based upon the finding of "medical improvement" and that J.A.B.'s impairments did not meet the adult disability criteria.[3]  Prior to the aforesaid denial of benefits (*i.e.*, of December 28,

---

[1]*See* 20 C.F.R. Pt. 404. Subpt. P, App. 1, § 100.02.

[2]*See* 20 C.F.R. § 416.987 (Disability Redeterminations for Individuals Who Attain the Age of 18).

[3]*See* ALJ John R. Burgess' Decision dated April 23, 2003 [Adm. Rec 25-32].



___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No _____

2000), claimant filed a separate application for Disabled Adult Child Benefits under the wage earner's (K. A. Martin's) account.[4]  Although plaintiff's request for hearing was based only upon the cessation of Supplemental Security Income benefits, her Disabled Adult Child's claim was elevated to the hearing level, consolidated and considered at the same time.  Plaintiff was found not disabled on initial review and on reconsideration.[5]  She was notified that her disability ceased effective May 31, 2001.[6]

At the hearing conducted by ALJ Burgess on January 23, 2003, plaintiff was represented by counsel, John Keeling.[7]  As aforestated, considering both plaintiff's application for Adult Disabled Child benefits and the cessation of supplemental security income, the ALJ determined that J.A.B. was no longer entitled to Child's Insurance (Disability) Benefits under Title II and no longer "disabled" or eligible for Supplemental Security Income payments under Title XVI of the Social Security Act.[8]

---

[4]*See* Decision of ALJ Burgess dated April 23, 2003 [Adm. Rec. 25].

[5]*See* Disability Determination and Transmittal dated May 22, 2001 [Adm.Rec. 68]; Disability Determination and Transmittal dated December 7, 2001 [Adm.Rec. 69].

[6]*See* Disability Hearing Officer's Decision, Analysis of Evidence and Determination (affirming the initial denial of J.A.B.'s Title II cessation disability claim based on multiple non-severe impairments) [Adm. Rec. 93-101]; Notices of Disability Hearing Decision dated December 11, 2001 [Adm. Rec. 112-118]; Request for Hearing by Administrative Law Judge dated December 18, 2001 [Adm. Rec. 119-122]; Decision of ALJ Burgess dated April 23, 2003 [Adm. Rec. 28].

[7]*See* Notice of January 23, 2003 Hearing [Adm. Rec. 128-130]; Transcript of the January 23, 2003 Hearing [Adm. Rec. 34-67].

[8]*See* Hearing Decision dated April 23, 2003 [Adm. Rec. 32]; Transcript of the January 23, 2003 Hearing (noting same and clarifying that "Title II CDB was denied on May 22, 2001" and that "the SSI claim was escalated") [Adm. Rec. 37-38].

2

Plaintiff filed a Request for Review of the Hearing Decision, arguing that the ALJ's decision was not supported by substantial evidence, *inter alia*.[9]  Plaintiff also elected to have all benefits continued pending the outcome of her appeal regarding the cessation of benefits.[10] On April 6, 2004, the Appeals Council denied the plaintiff's request for review.[11] Plaintiff then filed this action against Jo Anne Barnhart, Commissioner of Social Security ("Commissioner") pursuant to 42 U.S.C. § 405(g).  Plaintiff seeks judicial review of the Commissioner's decision, denying her claim for benefits under the Social Security Act.

Currently before the Court are the plaintiff's and the Commissioner's cross-motions for summary judgment.[12] Having reviewed the parties' written submissions, the administrative record and the applicable law, the undersigned Magistrate Judge finds that the Commissioner's decision is supported by substantial evidence and there RECOMMENDS that  plaintiff's motion for summary judgment be DENIED, defendant's cross-motion for summary judgment be GRANTED and that plaintiff's case be DISMISSED WITH PREJUDICE.

## I. BACKGROUND

### A. Procedural History

On April 23, 2003, ALJ John R. Burgess  issued a decision affirming the hearing officer's

---

[9]*See* Letter Brief Addressed to the Social Security Administration Appeals Council dated January 12, 2004 [Adm. Rec. 10-12]; Request for Review of Hearing Decision dated June 25, 2003 [Adm. Rec. 9].

[10]*See* Benefit Continuation Statement dated May 29, 2001 [Adm. Rec. 311].

[11]*See* Notice of Appeals Council Action/Order dated April 9, 2004 [Adm. Rec. 4-7].

[12]*See* Plaintiff's Letter Brief filed May 4, 2005 [Rec. Doc. No. 13]; Commissioner's Cross-Motion for Summary Judgment filed June 14, 2005 [Rec. Doc. No. 14].

decision that that J.A.B.'s impairments did not meet the adult disability criteria and further finding that she is not "disabled," nor eligible for benefits under Title II or Title XVI of the Social Security Act. After careful consideration of the entire record, ALJ Burgess found that since the comparison point decision, J.A.B. experienced "medical improvement." ALJ Burgess explained:

> While the claimant has initially found in 1990 to suffer from a severe growth impairment which met the listing requirements of Appendix 1, the present evidence fails to establish that the claimant continues to have any impairment or impairments which meet or equal the requirements of any listed impairment.
>
> *   *   *
>
> 4. The impairment present as of the claimant's most recent favorable decision was that she suffered from a severe growth impairment that met the requirements of section 100.02 of the Listing of Impairments, supra.
>
> 5. The claimant has experienced medical improvement in her condition that is related to her ability to work.
>
> 6. The claimant's subjective allegations concerning symptoms and functional limitations have been evaluated under the appropriate Regulations and Rulings and are found to be generally supported and acceptable but not to a disabling level.
>
> 7. Considering the preponderance of the evidence, as well as accepting the claimant's testimony almost verbatim as setting her functional capabilities, the claimant is found to have the residual functional capacity referenced in the body of the decision.[13]

Regarding the J.A.B.'s claimed limitations, the ALJ Burgess observed:

> At the hearing, the claimant testified that she falls if she stands any more than 15 minutes at a time. She claimed to experience pain in her legs about two times a week but admitted that it is not too severe and it is relieved by aspirin. However, she claimed difficulty climbing stairs and balancing. According to the claimant, the most that she can carry is a sack of schoolbooks. She also claimed that she could walk maybe three blocks. The claimant continued to wear glasses and testified that she can see with them but not at a distance. While she also claimed having headaches, she admitted that she takes medication that controls them. The claimant testified that she is able to dress herself for the most part. She further admitted that she is able to read, write and do simple mathematics. Although she claimed that she has always been slow in school and has had to be assisted by her teachers and tutors, she admitted that she was able to graduate from high school and is attending college where she is succeeding. As for her hearing loss, the claimant admitted that her

---

[13]Decision of ALJ Burgess dated April 23, 2003 [Adm. Rec. 28-31].

hearing aid helps significantly.

* * *

Granting the claimant the benefit of as much doubt as possible, and for the most part accepting her claimed hearing limitations at face value, I find that the claimant has the following residual functional capacity: she can lift about 10 pounds frequently and 20 pounds occasionally, which would roughly correspond to her admitted ability to lift a sack of books; she is limited to walking only three blocks at a time and standing for fifteen minutes at a time; there are no claimed limitations on her ability to sit; there is no reason to find that the claimant cannot alternate sitting, standing and walking for at least six hours out of an eight hour work day with normal breaks at lunch; because of her history of knee difficulties as well as her seizure disorder background, the claimant is precluded from any job requiring her to walk on uneven surfaces, to do continuous climbing of steps or working at heights. Further, I find that the claimant is limited to jobs requiring her to understand and follow only simple 1, 2, 3 step instructions and which would involve no technical reading which is based on her subjective complaints of having difficulty learning in school.[14]

## B. Facts Evinced at the Administrative Hearing

At the outset of the hearing, plaintiff's counsel presented additional documentation consisting of the transcript of J.A.B.'s past semester's course work at Delgado Community College.[15] Plaintiff testified that she was twenty years old ("a younger individual"), single, resided with her grandmother, her mother (Diana Breaux) drove her to the hearing and that she walked from the parking garage in the dome across the street to the hearing.[16]   Plaintiff further testified that she received her high school diploma in 2002 and was capable of reading, writing and performing simple mathematics.[17] As to her studies at Delgado College, plaintiff testified that she is tutored after class

---

[14]Decision of ALJ Burgess dated April 23, 2003 [Adm. Rec. 28-29].

[15]*See* Transcript of the January 23, 2003 Hearing [Adm. Rec. 36].

[16]*Id.* [Adm. Rec. 38-39].

[17]*Id.* [Adm. Rec. 39].

and given more time on tests, but that even with extra help she did not do that well.[18]

Plaintiff candidly admitted that she is capable of performing some work, however, she noted that she had certain limitations,[19] to wit: (1) she cannot stand for long period of time because she will fall down; (2) she has problems focusing on tasks for a long period of time; and (3) she has a hearing defect in her left ear which is corrected to normal with the use of a hearing aid.[20]   Plaintiff further explained that surgery corrected her knee problem, so that they no longer buckle.[21]   Plaintiff attributed her falling to "Stickler's Syndrome,"[22]  which causes her to walk with a limp and occasionally fall.[23]  Plaintiff admitted that an assistive device, such as a cane, would help her catch herself in the event of a fall.[24]

_____

[18]*Id.*  [Adm. Rec. 43, 47-48].

[19]*Id.* (Plaintiff testified that: "I don't feel that there's no work that I can do.  I just feel that I have certain limitations.") [Adm. Rec. 40].

[20]*See* Transcript of January 23, 2003 Hearing [Adm. Rec. 40-41].

[21]*Id.*  [Adm. Rec. 40].

[22]*See* Clinic Notes of Dr. Baxter Willis dated May 20, 1998 (noting that the plaintiff has a mild variant of Stickler syndrome associated with a cleft palate, hearing disorder, short stature and patellar dislocation)[Adm. Rec. 232];  Mental Status Evaluation dated March 13, 2001 (noting J.A.B.'s chief complaint, i.e., "a genetic condition known as Russell Sylver syndrome which has caused her short stature, arthritis, facial elongation ....") [Adm. Rec. 286]; *See also Blackiston* Gould's Medical Dictionary at p. 120 (Fourth Edition) (defining Russell dwarf as "a dwarf characterized by low weight and short stature at birth despite normal gestation, anomalies of the head, face and skeleton resembling those found in Silver's Syndrome but without the assymetry, lean small muscles, often varying degrees of mental retardation and sometimes ketotic hypoglycemia").

[23]*Id.*  [Adm. Rec. 42].

[24]*Id.*

Further addressing her physical limitations, plaintiff complained of experiencing "minor" pain in her legs and knees approximately twice a week which is relieved by taking aspirin.[25] Plaintiff agreed that she had been discharged from the neurology clinic on September 14, 2001 because her headaches were better.[26]

Plaintiff testified that stairs present a problem in that she must really take her time going up and down stairs or else she will fall. Plaintiff has problems with balance on a daily basis, but she is capable of carting around her book bag, which weighs approximately fifty pounds when it is loaded with her books. J.A.B. testified that she has no problem at all carrying less than fifty pounds.[27] Plaintiff estimated that she can walk about three blocks without any difficulty; she feels as though her legs or knees may give out if she walks a greater distance.[28]

Insofar as standing, plaintiff testified that she could stand without difficulty for about fifteen minutes and then she would have to sit down. Plaintiff stated that she has no problem whatsoever in the sitting position and that she could sit for eight hours.[29] As to bending and stooping, plaintiff indicated that she could not do any repetitive bending.[30] Plaintiff admitted that her vision was clear and that when she wore her glasses she could see both up close and the plaques on the wall.[31]

---

[25]*Id.* [Adm. Rec. 43, 48].

[26]*Id.* [Adm. Rec. 48].

[27]*Id.* [Adm. Rec. 44-45].

[28]*Id.* [Adm. Rec. 45].

[29]*Id.* [Adm. Rec. 46].

[30]*Id.*

[31]*Id.*

Addressing her daily activities, plaintiff testified that she attends school on a daily basis. On an average day, she wakes up, dresses herself but gets help tying her shoes. Plaintiff indicated that she has trouble tying her shoes tight enough so that they remain tied. After breakfast, plaintiff's mother drives her to school and she is worn out by the time that she arrives in her classroom because she has to walk up so many stairs.[32]

Plaintiff testified that her classes are each approximately fifty minutes long and that she has some problem focusing and paying attention to the teacher for that length of time. Her grandmother picks her up from school. When she has homework, she spends approximately an hour and a half to complete a whole assignment and math problems take her awhile. Plaintiff indicated that the primary reason why she has extra tutoring is to help her understand the math problems.[33] Aside from school, plaintiff indicated that she does not have any hobbies, but that she does attend functions with her family members.[34]

Based upon the plaintiff's testimony and the record, the ALJ found that the following capabilities, limitations and/or restrictions were applicable in the plaintiff's case, to wit: (1) the physical ability to lift ten pounds frequently and twenty pounds on an occasional basis; (2) the ability to stand for fifteen minutes at a time, to sit for an eight hour day and to alternate between sitting, standing and walking at least six hours out of an eight-hour work day excluding normal breaks; (3) the restriction from a workplace with uneven surfaces; (4) the absolute restriction from working at heights and work which requires continuous climbing of steps; (5) the limitation to those jobs that

---

[32]*Id.* [Adm. Rec. 47].

[33]*Id.* [Adm. Rec. 48].

[34]*Id.*

can be performed in simple steps after receiving simple instructions; and (6) the restriction from work which requires technical reading.[35]

Assuming a younger individual such as the plaintiff and the aforesaid capabilities and restrictions, as well as a high school education with one semester exposure to college work, Vocational Expert (VE) Mary Elvir opined that there were unskilled/entry level jobs available in the state and national economies in significant numbers that such a person could perform on a competitive and sustained basis,[36] for example: (1) sales counter clerk at the light exertional level [700 in Louisiana/24,000 nationally]; (2) unskilled level cashiers at the sedentary exertional level [2,672 in Louisiana/140,250 nationally] (3)unskilled cashiers at the light exertional level [8,000 in Louisiana/422,000 nationally]; (4) messengers at the light exertional level [1,835 in Louisiana/2,100 nationally]; (5) hand packers/packagers at the light exertional level [under 800 in Louisiana/106,500 nationally]; and (6) unarmed/unskilled security guards at the light exertional level [523 in Louisiana].[37] Addressing plaintiff's counsel's question regarding the additional limitation that may be imposed by the plaintiff's below average height (4'8"),[38] VE Elvir testified that the aforesaid cashier jobs could be reduced by as much as 50%, but plaintiff's stature would have no impact on any other job listed.[39] As to the additional limitation of a person whose pace is limited to a

---

[35]*See* Transcript of the January 23, 2003 Administrative Hearing [Adm. Rec. 50-51].

[36]*Id.* [Adm. Rec. 51].

[37]*Id.* [Adm. Rec. 52-55].

[38]*See* Plaintiff's Motion for Summary Judgment at p. 1[Rec. Doc. No. 13].

[39]*Id.* [Adm. Rec. 60].

significant degree, the VE testified that would only eliminate the hand packer/packaging jobs listed.[40] Combining both of these additional limitations would still leave a significant number of jobs available at both the sedentary and light exertional levels.[41]

The ALJ found that the additional limitations suggested by plaintiff's counsel were not supported by the objective record; however, assuming *arguendo* that the additional limitations were accepted VE Elvir testified that there would still be jobs not only available in the national economy, but also in the state in significant numbers that plaintiff was capable of performing.[42]

### C. Medical History

Having reviewed the medical treatment records and the reports of the examining consultants and treating physicians, *inter alia*, this Court finds that the ALJ's summary is substantially correct. ALJ Burgess provides a thorough discussion of all of the medical findings. The memorandum portion of his decision, insofar as it relates to the medical evidence, is undisputed, to wit:

> Specifically, the evidence reflects that the claimant suffered from a mild variant variant of congenital Sticklers syndrome, which is a genetic impairment which predominantly stunts growth but is also associated with a cleft palate, as well as hearing bone and joint, facial and heart problems. (Ex. 9E)

> Medical entries document that, as a child, the claimant experienced chronic patellar dislocations that required medical treatment. (Ex. 1F/16) However, clinic notes from April 1995 related that, at that time, four years had passed since the claimant's last knee surgery. There were no reports of subsequent problems with her joints, excepting of course, the normal post-surgical examinations and therapies. (Ex.1F/1)

> Further, the claimant has a history of related mild to moderate high frequency hearing loss in the right ear and mild to profound loss of hearing for mild to high frequencies

---

[40]*Id.* [Adm. Rec. 63-65].

[41]*Id.* [Adm. Rec. 65].

[42]*See* Decision of ALJ Burgess [Adm. Rec. 30].

in the left ear.  As a result, she has used a hearing aide in the left ear for quite some time.  As recently as December of 1996, when she obtained a new hearing aid, the claimant was reported to be doing well in school and did not require any speech therapy services.  (Ex 5F/7, 8)

While it is not clear when it was first diagnosed, entries suggest that sometime in the past, the claimant had been diagnosed with a seizure disorder.  However, current evidence fails to confirm that the claimant still suffers from that malady to any significant extent.  Even if it exists, there is no evidence that the condition is not satisfactorily controlled with medication.

In February 2000, the claimant was evaluated in a clinic for possible seizure attack after her mother complained that she had been falling once a month and had recently run into a wall.  While the examiner did not believe that the two incidents were seizure related, an EEG was slated to confirm whether or not she had underlying signs of such a condition.  Unfortunately, the record does not document whether such an EEG was ever performed. (Ex. 11F/5, 6)

Six months later, on August 23, 2000, the claimant was reported to have been seizure free for many years.  (Ex. 11F/7)  Additionally, on February 9, 2001, the claimant was seen in a neurology clinic because she needed clearance to march with her school band after allegedly experiencing a syncopal episode.  Although no test results are contained in the record, the fact that it is documented that claimant was eventually granted her requested clearance after tests proved normal strongly suggests that she is presently asymptomatic for any seizure activity.  (Ex. 23F/10, 11)

Consulting psychologist, Carlos Reinoso Ph.D, evaluated the claimant on March 13, 2001.  During the interview, her mother reported that the claimant continued on Concerta for her ADHD.  She remained in good health without any noted problems with attention, impulsivity or hyperactivity.  The claimant was reportedly still in school, had never failed any grades and had never required special education services.  According to the examiner, she demonstrated adequate attention, persistence and pace.  In fact, no psychosis or significant emotional difficulties were found to be present.  (Ex. 15F)

Because of her history of hearing loss, the claimant underwent audiologic evaluation on July 30, 2001.  Essentially, she was tested on the performance of her hearing aid with those results interpreted as showing word discrimination scores of 88% at normal conversation levels.  Based on the outcome, the only recommendations that were made were that the claimant be afforded preferential seating in school to maximize her performance opportunities and she was advised to wear hearing protection when exposed to a lot of noise.  (Ex. 23F/7)

On August 1, 2001, the claimant was again examined at the medical clinic.  That

entry reflects that despite a history of wearing glasses, her corrected vision was relatively normal. Additionally, it was reported that while there was some mild apprehension about her left patella, the claimant's right knee was stable and she had no objective problems with her hips, feet, ankles or spine. (Ex. 23F/6)

The claimant's most recent medical entries are from September 14, 2001. At that time, it was noted that a recent MRI of the brain had revealed no masses and just two focal areas of signal abnormality in the left occipital and parietal regions, [which was unchanged from the previous MRI in 1995]. Those results were considered to be of uncertain significance. Although claimant's mother continued to complain that the claimant was falling a few times a month, the objective physical examination was essentially negative. (Ex. 23F/3)[43]

Based upon the foregoing and other evidence of record, the ALJ determined that the claimant had "severe" impairments (including congenital connective tissue disorder, seizure problems, infrequent falls that were not seizure related, ADHD treated with Ritalin, diminished vision corrected to normal with glasses, hearing loss managed with prescription hearing aid and patella dislocations corrected by surgery in 1991). Nevertheless, the ALJ further found that J.A.B. had experienced medical improvement and that her difficulties are no longer so severe as to preclude her working at all levels.[44]

## II. APPLICABLE LAW

### A. Standards of Review

The function of this Court on judicial review is limited to determining whether there is "substantial evidence" in the record, as a whole, to support the final decision of the Commissioner as trier of fact, and whether the Commissioner applied the appropriate legal standards in evaluating

---

[43]Decision of ALJ Burgess dated January 23, 2003 [Adm. Rec. 26-28].

[44]*Id.* at 28.

12

the evidence.[45] "Substantial evidence" is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion.[46] The evidence must be more than a scintilla, but may be less than a preponderance.[47]

The Commissioner is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.[48] A district court may not try the issues *de novo*, re-weigh the evidence or substitute its own judgment for that of the Commissioner.[49] It must, however, scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.[50]  Any of the findings of fact by the Commissioner that are supported by substantial evidence are conclusive.[51]

### B. Cessation of Benefits

Those claiming disability insurance benefits under the Act have the burden of showing the existence of disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted

---

[45]*See* 42 U.S.C. § 405(g);  *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993); *Carriere v. Sullivan*, 944 F.2d 243, 245 (5th Cir. 1991); *Villa v. Sullivan*, 895 F.2d 1019, 1021(5th Cir. 1990); *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993).

[46]*Richardson v. Perales,* 402 U.S. 389, 401(1971); and *Spellman*, 1 F.3d at 360.

[47] *Id.*

[48]*See Arkansas v. Oklahoma*, 503 U.S. 91 (1992).

[49]*Ripley*, 67 F.3d at 555; *Spellman,* 1 F.3d at 360; and *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990).

[50]*Anthony v. Sullivan,* 954 F.2d 289, 295 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

[51]*Ripley,* 67 F.3d at 554.

or can be expected to last for a continuous period of not less than 12 months."[52]

Establishment of "disability" within the meaning of the Act is twofold.  First, the claimant must demonstrate that she suffers from a medically determinable impairment.[53]  Second, the claimant must prove that her impairment or combination of impairments render her unable to engage either in the work she previously performed or other substantial gainful employment that exists in the national economy.[54]

As set forth above, the law requires, in every case, that the Commissioner make an individual determination as to whether the claimant is disabled.[55]  Once a person is found disabled and benefits are awarded, the Commissioner may terminate those benefits only if the applicant's condition improves.  Thus, termination of benefits is applicable only where substantial evidence shows that:

> There has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and the individual is now able to engage in substantial gainful activity.[56]

"Medical improvement" is any decrease in the medical severity of the claimant's impairment or combination of impairments.[57]

In some cases, the evidence shows that an individual's impairments are subject to temporary remission. In assessing whether medical improvement has occurred in persons with this type of

---

[52]42 U.S.C. § 423(d)(1)(A).

[53]42 U.S.C. §§ 416(I)(1), 423(d)(2)(A).

[54]42 U.S.C. §§ 416(I)(1), 423(d)(2).

[55]*Heckler v. Campbell,* 461 U.S.458 (1983).

[56]42 U.S.C. § 423(f)(1).

[57]20 C.F.R. 404.1594(b)(1).

impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission and prospects for future worsening. Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.[58]  A determination of medical improvement will be made if there is a decrease in medical severity based on improvement in the symptoms, signs and/or laboratory findings associated with the impairment.[59]

To justify termination, substantial evidence must also demonstrate that any medical improvement is related to the individual's ability to work.[60]  If it is determined that the recipient's condition has medically improved and the improvement is related to the claimant's ability to work, the ALJ should consider the claimant's current impairments, which may include new impairments, and determine whether these may, nonetheless, preclude substantial gainful activity.[61]

The Secretary follows an eight step sequential evaluation process to resolve whether such "medical improvement" has occurred.[62]  These eight steps are as follows:

(1)     Is the recipient engaged in substantial gainful activity? 20 C.F.R. § 404.1594(f)(1). If so, his or her disability has ended. If not, proceed to step 2.

(2)     Does the recipient's impairment or combination of impairments meet or equal in severity a current listed impairment?  20 C.F.R. § 404.1594(f)(2). If so, disability is found to continue on that basis.  Otherwise, the evaluation continues.

(3)     Has the recipient's condition medically improved?     20 C.F.R. §

---

[58] 20 C.F.R. § 404.1594(iv).

[59] 20 C.F.R. § 404.1594-(b)(1).

[60] 42 U.S.C. § 423(f)(1)(A); 20 C.F.R. § 404.1594(b)(2).

[61] 20 C.F.R. § 404.1594(b)(5).

[62] 20 C.F.R. § 404.1594(f).

404.1594(f)(3).  If so, the evaluation proceeds to step 4.  If not the evaluation jumps to step 5.

(4)     Is the medical improvement related to the recipient's ability to work?  20 C.F.R. § 404.1594(f)(4).  If not, the evaluation proceeds to step 5.  If so, the evaluation jumps to step 6.

(5)     Does an exception to the use of the "medical improvement" standard exist?  20 C.F.R. § 404.1594(f)(5).  If not, the recipient's disability is found to continue.  If so, the evaluation will proceed, unless the exception is one involving fraud, non-cooperation, etc. listed in 20 C.F.R. § 404.1594(e).

(6)     Does the recipient now have a severe impairment or combination of impairments? 20 C.F.R. § 404.1594(f)(6).  If not, benefits are stopped.  If so, the evaluation continues.

(7)     Can the recipient now perform past relevant work? 20 C.F.R. § 404.1594(f)(7).  If so, benefits are stopped.  If not, the evaluation continues.

(8)     Can the recipient now engage in other work, considering his/her age, education, and past work experience.  20 C.F.R. § 404.1594(f)(6).  If so, benefits are stopped, and if not, benefits continue .

See also ALJ Burgess' Decision [Adm. Rec. 30-31]. In termination proceedings, the burden of proof regarding "medical improvement," as well as the ultimate burden of proof, lies with the Commissioner.[63]

### C. Treating Source's Statements and Determinations

Ordinarily, the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment and responses should be accorded considerable or great weight in determining disability.[64]  The ALJ may assign less weight to a treating physician's

---

[63]See Griego v. Sullivan, 940 F.2d 942, 944 n. 1 (5th Cir. 1991)(noting that the statute (§ 423(f)) clearly places the ultimate burden of proof on the Commissioner); see also Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

[64]See Loza v. Apfel, 219 F.3d 378, 395 (5th Cir. 2000); Newton, 209 F.3d at 455.

opinion when there is good cause shown to the contrary.  "A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence."[65]  The opinion of a specialist is generally accorded greater weight than a non-specialist.[66]

Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status.[67]  Treating physicians' opinions are not conclusive regarding matters reserved to the Commissioner.[68]

### III. ANALYSIS

In this case, the Commissioner's determination of "medical improvement" is undisputed with respect to plaintiff's history of patella dislocations that required surgery and congenital tissue disorder/growth impairment which met the section 100.02 (child) of the Listing of Impairments. Plaintiff contends that she is entitled to benefits so that she does not regress and develop symptoms. She argues that her conditions have an impact on her physically, cognitively and mentally and that she will always need the assistance of her physicians,  Dr. Gail Wilson and  Dr. John Firestone. Plaintiff notes that she is presently attending Delgado College on a part time basis and employed as

---

[65]*Newton*, 209 F.3d at 455 (citations and inner alterations omitted).

[66]*Id.* (*citing Paul v. Shalala,* 29 F.3d 208 211 (5th Cir. 1994).

[67]*Id.* at 456.

[68]*Id.* (*citing Brown*, 192 F.3d at 500).

17

a seasonal worker at City Park in the refreshment area, refilling drinks and making cotton candy.[69]

The Commissioner seeks summary judgment in her favor and contends that the evidence submitted on behalf of the plaintiff does demonstrate functional limitations that would preclude the performance of unskilled light and sedentary work. Essentially the Commissioner argues that her decision is substantially correct.

In this case, plaintiff points to no medical or other evidence that raises any cause for concern. To the extent that the ALJ rejected plaintiff's claims of debilitating limitations, that decision was plainly premised upon the absence of ongoing medical treatment, which would support any claim of *disabling* limitations.   A review of the entire record reveals that plaintiff  was at all pertinent times functioning well with many daily activities including attending Delgado College on a part-time basis, which was and remains consistent with some level of gainful employment.  The record evidence is ample to support the ALJ's credibility determinations and other findings with respect to the plaintiff's impairments and residual functional capacity.

Clearly plaintiff is not disabled *per se* under the adult criteria for any listing and the plaintiff points to no such listing. Addressing plaintiff's claim regarding her inability to ambulate effectively, Listing 1.02, it states:

> Major dysfunction of a joint(s) (due to any cause):   Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs and limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankyloses of the affected joint(s). With:
> A. Involvement of one major peripheral weight bearing joint (i.e., hip, knee or ankle), *resulting in inability to ambulate effectively*, as defined in

---

[69]*See* Plaintiff's Letter Brief dated April 27, 2005 [Rec. Doc. No. 13].

1.00(B)(2)(b);....[70]

Listing 1.00(B)(2)(b) provides:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  Individuals must have the ability to travel without companion assistance to and from a place of employment....  Examples of ineffective ambulation include ... the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking ....[71]

Substantial evidence in this case supports the ALJ's determination that J.A.B. ambulates effectively without the use of any assistive device.

In his decision, ALJ Burgess accurately summarized the medical evidence concluding that none of J.A.B.'s alleged impairments met or equaled the requirements of any of the listings.  The ALJ based his decision on the objective medical findings, the paucity of treatment, the plaintiff's own testimony regarding her pain and limitations and the record as whole.  Therefore, in that regard, the ALJ did not err.  The ALJ fulfilled his duty to develop a full and fair record by ordering physical and mental examinations by consulting physicians.

Plaintiff's contention that without prescription medications (Concerta and Strattera) for ADHD she is unable to maintain her grades at Delgado Community College does not shake the foundation of ALJ's decision.   Under the prevailing law, a "medical condition that can be reasonably remedied by either surgery, treatment or medication is not disabling."[72]   This Court

---

[70] 20 C.F.R. Part 404, Subpart P, Appendix I, Listing 1.02A.

[71] 20 C.F.R. Part 404, Subpart P, Appendix I, Listing 1.00(B)(2)(b).

[72] *Lovelace v. Bowen*,  813 F.2d 55, 59 (5th Cir. 1987).

19

recognizes that a medical condition that is potentially remediable with medication remains disabling when the plaintiff can establish both that he or she cannot afford the prescribed treatment and that there is no way to obtain it.[73]  However, plaintiff has failed to make either showing.

Turning to plaintiff's alleged depression, the medical record does not support plaintiff's assertion that she suffered from depression. Dr. Carlos Reinoso's mental status evaluation states that the plaintiff denied any significant anxiety or depressive related concerns.[74]  Additionally, Dr. Reinoso observed:

> [J.A.B.'s] presentation, parental report and behavioral history do not suggest any psychosis.  She did not present with any significant emotional concerns.  [J.A.B.] may likely require some assistance with management of finances.  Upon graduation, she may benefit from vocational training.[75]

Dr. Reinoso specifically noted that, at the time of the examination, plaintiff was taking Concerta and that her mood and affect were appropriate throughout.  Moreover, no problems were noted with attention, impulsivity or hyperactivity.  Dr. Reinoso further reported that he easily established rapport with the plaintiff and that, overall, she demonstrated adequate concentration, persistence and pace.[76]

---

[73]*Id. (citing Taylor v. Bowen,* 782 F.2d 1294, 1298 (5th Cir. 1986).

[74]*See* Mental Status Evaluation dated March 13, 2001 [Adm. Rec. 287]. See also Psychiatric Review Technique dated March 27, 2001 (finding no medically determinable impairment and noting that the claimant was enrolled in *non-*special education at St. Mary's Academy) [Adm. Rec. 289].

[75]Mental Status Evaluation dated March 13, 2001 [Adm. Rec. 288].

[76]*Id.* [Adm. Rec. 287].

Turning to plaintiff's physical condition, clinic notes dated February, 2001 note that plaintiff's "motor exam was normal with normal strength and tone and the gait was normal as well."[77] The Commissioner correctly notes that the objective medical evidence supports the ALJ's RFC determination that plaintiff can perform light/sedentary level work with the additional limitations of no walking on uneven surfaces, continuous climbing of steps or working at heights. VE Elvir's testimony responding to the ALJ's hypothetical constitutes substantial evidence supporting the Commissioner's decision that plaintiff was not disabled.

By all accounts, plaintiff has experienced "medical improvement" related to her ability to work. J.A.B.'s well-documented level of activity and adaptability admits as much. In this regard, plaintiff highlights that she is currently a part-time student at Delgado Community College and also works concessions part-time at City Park. The record is devoid of evidence that suggests that the plaintiff was either housebound, ineffective ambulating or otherwise incapable of caring for herself.[78]

In formulating his opinion, the ALJ sifted through the record, analyzed the findings of the various medical source statements and built the requisite logical bridge between the documentary/ testimonial evidence and his opinion that the plaintiff is no longer "disabled" and is capable of performing certain unskilled light and sedentary level work which exists in Louisiana and nationally in significant numbers.

---

[77]Dr. McAllister's Neurology Clinic Notes dated February 9, 2001 [Adm. Rec. 314]. *See also* Neurology Clinic Notes dated August 26, 2001 (sensation intact, normal in all extremities, normal Rhomberg and gait is also normal).

[78]*See* Disability Report dated May 29, 2001, Part III entitled Information About Your Activities (noting no limitations placed on plaintiff's activities by her physicians and describing plaintiff's daily, recreational and social activities) [Adm. Rec. 161-164].

## IV. CONCLUSION

Having conducted a *de novo* review of the administrative record and considering the record as whole, the undersigned Magistrate Judge finds that the Commissioner's decision is supported by "substantial evidence."[79]  Where the Commissioner's decision terminating benefits rests on adequate findings of "medical improvement" supported by evidence having rational probative force, a reviewing court must not substitute its judgment for that of the Commissioner.  Accordingly, the Court makes the following recommendation, to wit:

**IT IS RECOMMENDED** that the plaintiff's motion for summary judgment be DENIED, the Commissioner's motion for summary judgment be GRANTED and plaintiff's complaint be DISMISSED WITH PREJUDICE.

## OBJECTIONS

A party's failure to written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 8 day of February, 2006.

DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE

---

[79]*See* 42 U.S.C. § 405(g); *Mathews v. Eldridge,* 424 U.S. 319, 339 n.21 (1976).